HINTON *v.* STATE

No. 42637          April 1, 1963          151 So. 2d 413

*Lawrence D. Arrington,* Hattiesburg, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

KYLE, J.

The appellant, Louise Hinton, was tried on an indictment for murder in the killing of W. O. Hinton, and was found guilty of manslaughter at the September 1962 Term of the Circuit Court of Perry County, and was sentenced to serve a term of ten years in the state penitentiary. A motion for a new trial was overruled; and from the judgment of conviction and sentence she has prosecuted this appeal.

The appellant has assigned and argued three points as ground for reversal of the judgment of the lower court: (1) That the verdict of the jury is contrary to the overwhelming weight of the evidence; (2) that the court erred in overruling the defendant's motion for a directed verdict of not guilty at the conclusion of the testimony offered on behalf of the State; and (3) that the court erred in overruling the defendant's motion for a peremptory instruction at the conclusion of all of the testimony.

The record shows that the deceased W. O. Hinton lived with his son, Jerry Lee Hinton, in a comfortable home about six miles north of the Town of New Augusta, in Perry County. The homicide was committed on a graveled driveway in front of the Hinton home sometime after midnight February 7, 1962. The appellant had lived with the deceased for a period of two or more years prior to 1962, apparently as his wife, although they were not married. The appellant's two daughters also lived in the Hinton home as members of the family during that time. The appellant, however, had left the Hinton home sometime during the year 1960, and was

living in the City of Hattiesburg with her daughter, Webber Lee, at the time of the homicide. The deceased had formed an acquaintance with another woman, Dorothy Nettles; and Dorothy and her young son and daughter were at the home of the deceased on the night of February 7, 1962, when the appellant and her 19-year old daughter, Webber Lee Hinton, came to the home of the deceased in their own automobile about 9:00 o'clock P.M.

Jerry Hinton, the son of the deceased, and Webber Lee Hinton, the defendant's daughter, were the only eye-witnesses who testified during the trial. Jerry was called to testify as a witness for the State, and Webber Lee was called to testify as a witness for the defendant.

Jerry Hinton testified that Louise and Webber Lee parked their car in front of the house by the side of the gate leading into a small front yard. Jerry and Jimmy were playing darts on the porch. Dot and her two children had come to the Hinton home about 4:30 P.M. When Louise and Webber Lee arrived they went into the living room. Jerry and Jimmy continued to play darts. Jerry stated that when he went into the living room later, Webber Lee and Dot were in there talking. His father and Louise came back into the living room from the back porch, where they had been talking to each other. Louise came in and told Dot "if she had anything there that she could get it and get gone." Dot said, "Well, I don't see where I have to leave." W. O. Hinton was sitting on the couch in the living room. Louise and Dot kept squabbling, and finally both women said to W. O., "Its up to you", and W. O. said, "Well, its between you all too." The argument continued about 30 minutes. Each of the two women claimed that W. O. had planned to marry her. Finally Dot and her children left around 10:30 or 11:00 P.M.

Jerry testified that up to the time that Dot Nettles left no blow had been struck, and no threats made by

anyone; but after Dot left it "seemed like everything broke loose." His father and Louise were fussing and cussing. There was nothing unusual about that, and Jerry and Webber Lee went into W. O. Hinton's bedroom and played the record player until about 12 o'clock. Jerry finally went into his own bedroom and lay down. Webber Lee continued to play the record player. Jerry later heard his daddy call him, but he could not understand what his daddy said. He looked through the door which opened into the living room, and he saw his daddy and Louise in there. He figured the call was not important, so he lay back down on his bed. After a time he heard the front door slam, and he heard his daddy call him again. He went to the front door and saw Webber Lee going toward Louise's car, and he heard Louise say to Webber Lee, "Run and get the gun." He saw his father holding Louise, who was trying to get away from him to go to the car. W. O. went down the steps, taking Louise with him, and tried to go to the car. Webber Lee at that time had the gun in her hand, and Webber Lee said to W. O., "Big-un turn her aloose." Jerry stated that his daddy was holding Louise; but he had not struck her or threatened her in any manner, so far as he could see. Webber Lee ran around the car and said, "I am going to give you one more chance, now turn her aloose." Webber Lee then fired one shot toward the Prospect community store. W. O. turned Louise aloose and went toward Webber Lee. Webber Lee ran in front of the car and tossed the gun over to Louise, and another shot was fired. Jerry saw the fire but did not hear the shot. The pistol was in Louise's hands at that time. W. O. was between the pistol and the house, and the pistol was pointed in that direction.

Jerry stated that when the second shot was fired, W. O. turned and took about two steps and "lumped"

on Louise. "It looked like his arms were over her shoulders." Louise went backward into the lane and both fell to the ground. W. O. was on top. About twenty seconds later another shot was fired. When Louise got up she had the pistol in her hand. Jerry stated that at no time did he see his daddy strike Louise or try to choke her or grab her by the hair of her head.

Webber Lee Hinton, who was called to testify on behalf of the defendant, testified that after Dot Nettles and her children left, W. O. said to the appellant, "You are staying with me tonight * * * I am not going after her (Dot Nettles). I want you and you are gonna stay." After a time the appellant said, "I've got to go home * * * I told you that I had to go home, that Shelby Gene is sick, and I've got to be there in the morning." W. O. then said, "Well, I'll take you then." The appellant said, "No, I've got to go now," and the deceased replied, "Well, you are not leaving here tonight." Webber Lee stated that the appellant again started to leave, and W. O. grabbed her around the waist; that appellant got loose, and W. O. then said to her, "I will kill you before you leave here tonight," and W. O. called to Jerry and told him to bring him the rifle. Webber Lee stated that her mother then asked her to get the pistol, and she went to the car which was parked about two feet from the yard fence and got the .22-calibre revolver which had been in the glove compartment of the car since she and her mother had made a trip to New Orleans the week before. Webber Lee stated that after she got the pistol W. O. said to her, "Girl, that dam gun is going to get you into trouble," and when W. O. came close to her, he reached across the gate with one hand and caught her by the arm; that she jerked away from him, and in doing so her dress was torn; that her mother was trying to get away from W. O., and W. O. hit her on the side of her head with his fist, and it was then that she fired one shot into the air. Webber Lee stated

that W. O. then grabbed her by the dress, and she pitched the gun to her mother, and her mother turned and fired a shot toward the pond; that W. O. then turned and ran toward her mother and grabbed her, and both fell to the ground fighting, and they were fighting over the gun when the third shot was fired. Webber Lee then walked over and took the gun out of her mother's hand, and called to Jerry to go into the house and get a flash light.

Several other witnesses were called to testify on behalf of the State.

Henry Jones, the undertaker, testified that when he dressed the body for burial he found a hole in the back of the head just above the ear on the left side. The bullet did not come out. He found no evidence of powder or smoke burns in the area where the slug entered, or on the body or clothing of the deceased. Dr. Thomas F. Puckett testified that he conducted a partial autopsy of the body. The only evidence of external violence found was a hole in the scalp behind and below the left ear. He removed the bullet. It was a slug of small calibre. It had severed the spinal cord at the base of the brain. There was no evidence of powder burns.

Two police officers of the City of Hattiesburg testified that they were called to the Methodist Hospital in Hattiesburg about 1:00 o'clock A.M. on February 8. Mr. Hinton had been brought to the hospital at the time they arrived. He died a few minutes after they arrived. The two officers stated that they talked to Louise Hinton; and that the statements made by her were made freely and voluntarily. She was asked whether she was Mr. Hinton's wife or relative, and she stated that she was not. She was asked whether she knew who shot Mr. Hinton and she stated that she had shot him. She was then asked whether they were fighting or scuffling when she shot Mr. Hinton. Her answer was, "No." She then stated that he was "trying to get her daughter." The

police officers testified that they observed no marks or bruises of any kind upon the appellant while they were talking to her. She told them that the pistol was in the glove compartment of her car.

Virgil Walters, Sheriff of Perry County, testified that he received the pistol referred to above from an officer after Mr. Hinton's death in the Methodist Hospital and he brought the pistol to New Augusta. It had three cartridges in it that had been fired and one snap, and two additional cartridges. It was a .22-calibre pistol.

(Hn 1) It is argued on behalf of the appellant that the State wholly failed to prove the appellee guilty of manslaughter, and that the judgment of the lower court should be reversed and the appellant discharged. It is argued that the case falls squarely under the rule laid down by this Court in the Weathersby case, 165 Miss. 207, 147 So. 481, that, where the defendant or his witnesses were the only eyewitnesses of a homicide, their version must be accepted unless substantially- contradicted in material particulars by credible witnesses, physical facts or facts commonly known.

(Hn 2) We think the rule laid down in the Weathersby case is not applicable to the facts in this case. The defendant did not testify, and the defendant's witness, Webber Lee Hinton, was not the only eyewitness who testified. The State's witness, Jerry Hinton, saw and heard all that occurred after the parties left the front porch of W. O.'s dwelling house. Jerry's testimony contradicts the testimony of Webber Lee in several important particulars. The testimony of Jerry, which the jury appears to have accepted as true, along with the other testimony in the record, was, in our opinion, sufficient to support the jury's finding that the appellant was not in imminent danger of death or great bodily harm at the hands of the deceased, at the time she fired the fatal shot, and that the appellant did not have rea-

sonable grounds to apprehend a design on the part of the deceased to kill her, or to do her some great bodily harm. **(Hn 3)** The conflicts in the testimony of the two eyewitnesses presented questions of fact for the jury to decide. The law of the case was correctly stated in the instructions given by the court to the respective parties. **(Hn 4)** The jury was the judge of the weight of the testimony and the credibility of the witnesses.

**(Hn 5)** We think it cannot be said that the verdict of the jury is contrary to the overwhelming weight of the evidence, or that the court erred in overruling the appellant's motions for a peremptory instruction at the conclusion of the testimony offered by the State and at the conclusion of all the testimony.

We find no reversible error in the record and the judgment of the lower court is therefore affirmed.

Affirmed.

*McGehee, C. J., and Ethridge, Rodgers and Jones, JJ.,* concur.